UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:04-cr-138 |
| | ) | *Collier /Lee* |
| JOSEPH SWAFFORD and | ) | |
| JES, INC., d/b/a BROADWAY HOME | ) | |
| AND GARDEN CENTER | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant Joseph Swafford ("Swafford") timely filed a motion to suppress evidence which resulted from or is traceable to certain undercover law enforcement surveillance related to the defendants' sale of iodine on October 4, 2004[1] [Doc. No. 111]. The government filed its brief in opposition to the motion [Doc. No. 123], and an evidentiary hearing was set [Doc. No. 118]. At the January 23, 2006 evidentiary hearing, JES, Inc. d/b/a Broadway Home and Garden Center ("JES/Broadway") moved to join in Swafford's motion to suppress. As there was no objection to JES/Broadway joining the motion to suppress, it was allowed to join in the motion[2], although the deadline for the filing of motions had passed [*see* Doc. No. 84]. The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. No. 113]. For the reasons stated herein, it is **RECOMMENDED** the defendants' motion to suppress

---

[1] Although the parties' briefs refer to September 30, 2004, apparently based on information contained in the Superceding Indictment, based on the evidence the undercover law enforcement surveillance at issue occurred on October 4, 2004.

[2] At the prior motion to suppress hearing, the parties agreed Swafford and JES/Broadway have the same standing to seek suppression, and that the ruling on the first motion to suppress would apply the same as to each of the defendants [Doc. No. 47 at 2]. There was no argument to the contrary at the January 23, 2006 hearing.

[Doc. No. 111] be **GRANTED IN PART** and **DENIED IN PART**.

Because of the approaching trial date and the similarity of the legal issues raised in the pending motion to suppress and the previously ruled upon motion to suppress, the Honorable Curtis L. Collier requests that any objections to this Report and Recommendation be served and filed within **five** days after service of a copy of this recommended disposition.

Present at the hearing were Attorney Paul Laymon for the government; Attorneys Paul D. Cross and Howell G. Clements for Swafford; and Attorney Thomas C. Greenholtz for JES/Broadway. Before calling witnesses, Attorney Laymon stated the government agrees evidence of observations by Special Agent Dave Shelton ("Shelton") during his undercover surveillance at JES/Broadway on Shelton's first visit on October 4, 2004, including any statements made by Swafford to Shelton on October 4, 2004, would not be introduced during the government's case-in-chief because such evidence is properly suppressed in light of the Court's ruling on the defendants' prior motion to suppress [Doc. Nos. 47, 50, 51]. Attorney Laymon further represented that, after the defendants were indicted by the grand jury on September 15, 2004, the only date when the government made undercover contact with Swafford was October 4, 2004. On that date, the government made contact with Swafford twice as more fully set out in the Court's prior rulings [Doc. Nos. 47, 50, 51].

At issue in the current motion to suppress is whether evidence gained as a result of stopping certain customers after they left JES/Broadway on October 4, 2004 should be suppressed. In other words, whether the evidence allegedly "traceable" to the October 4, 2004 surveillance that took place during Shelton's first visit to JES/Broadway should be suppressed. Based upon the testimony concerning both the prior and current suppression motions, it appears Shelton was the only person

2

working in an undercover capacity to have contact with Swafford on October 4, 2004. No surveillance or "spot checking", which may have occurred between the indictment and Shelton's first visit to JES/Broadway on October 4, 2004, no contact with Swafford by confidential informants and no controlled purchases of iodine, if any exist, are at issue in this Report and Recommendation.

## II. Relevant Facts

Detective Lieutenant Tommy Farmer ("Farmer") of the Hamilton County Sheriff's Department was the sole witness at the January 23, 2006 hearing.

*Detective Farmer's Testimony*

Farmer testified he was present in the observation vehicle, along with other law enforcement officers, when Shelton, who was wearing a wire (an undercover listening device) entered JES/Broadway and engaged in conversation with Swafford on October 4, 2004. Farmer was monitoring the wire worn by Shelton. Farmer testified law enforcement officers had the JES/Broadway premises under surveillance when Shelton entered the business. There were law enforcement surveillance units located in all four directions around the JES/Broadway premises. Not only was this surveillance in place when Shelton entered JES/Broadway, but Farmer estimated the surveillance continued for approximately one hour after Shelton finished his conversation with Swafford and left the JES/Broadway premises.

While Shelton was present at JES/Broadway during the initial surveillance on October 4, 2004, customers were coming in and out of the business. Based upon what Farmer heard over the wire worn by Shelton, Farmer had reason to believe some of these customers were making purchases of iodine. Specifically, based upon what he overheard while Shelton was inside JES/Broadway, Farmer was aware three customers purchased iodine. None of these three individuals were stopped

by law enforcement.

After Shelton left JES/Broadway, however, a total of three vehicles were stopped after they left JES/Broadway. These three vehicles had a total of five occupants. The first of the three vehicles stopped was a Nissan pickup truck. Mr. Johnson was the driver and sole occupant of the Nissan pickup truck. Farmer testified the stop of the Nissan pickup truck was the only one of the three stops which was related to information gained during Shelton's undercover presence at JES/Broadway.

Based on something Shelton said over the wire he was wearing, Farmer had reason to believe the driver of the Nissan pickup truck purchased iodine. Farmer could not recall exactly what Shelton said over the wire, however, Shelton did give a vehicle description of the Nissan pickup truck. After both Shelton and the Nissan pickup truck left the JES/Broadway premises, the truck was stopped by law enforcement officers. Although the Nissan pickup truck was stopped, Farmer testified the driver of the vehicle was not arrested.

The next vehicle stopped was a Ford F-100 pickup truck. Mr. Bailey was the driver and sole occupant of the Ford F-100 pickup truck. Farmer testified the stop of the F-100 pickup truck was unrelated to Shelton's presence at JES/Broadway. He stated the F-100 pickup truck was stopped because of observations about the driver by the law enforcement personnel conducting surveillance after Shelton left. Explaining that the driver "fit our MO" and "fit the typical meth user", Farmer said the Ford F-100 pickup truck was stopped because the driver was thin and alone, the vehicle had out-of-state license tags, the driver was inside the JES/Broadway premises for only a few minutes, and he left the store carrying only a single purchase. The Ford F-100 pickup truck had not been observed at JES/Broadway on prior occasions, but after the stop the driver admitted he had made

4

prior purchases of iodine there. In addition, the police ran the license tag number of the F-100 pickup truck at some point and learned the driver was wanted on an outstanding warrant related to a driving offense. Bailey was arrested based upon the warrant, but was not arrested for the purchase of iodine.

The third and last vehicle stopped on October 4, 2004 was a Chevrolet Camaro. There were three persons in the Camaro. Farmer testified a canine patrol unit followed and stopped the Camaro. Farmer said the canine unit typically looks for a registration or traffic violation, and the Camaro was stopped based upon some sort of observation made by law enforcement. However, because Farmer was not involved in the stop, he could not testify about what was observed by the patrol unit stopping the Camaro. While Farmer was not involved in the stop of the Camaro, he did personally observe it leaving the JES/Broadway parking lot some time after Agent Shelton had left. Farmer testified when the Camaro was stopped, the occupants of the vehicle admitted methamphetamine use, but denied going to JES/Broadway or purchasing the iodine, which was in plain view in the back hatch of the Camaro. One of the passengers in the Camaro, Mr. Ellison, was arrested because there was an outstanding warrant issued for his arrest for a probation violation. No one from the Camaro was arrested for the purchase of iodine.

At the conclusion of Farmer's testimony, the Court asked counsel for the parties whether there was a tape recording or transcript of Shelton's conversation with Swafford which would show what, if anything, Shelton said via his wire to Farmer about the Nissan pickup truck or its driver. Counsel for the parties stated the conversation between Swafford and Shelton on October 4, 2004 was transcribed, and they requested a brief recess to review their respective transcripts. Following a brief recess, counsel for the parties stated their respective transcripts did not show exactly what

Shelton said about the Nissan pickup truck to Farmer because the transcripts concerned only the conversation between Shelton and Swafford.

As Shelton was leaving JES/Broadway, he and Swafford walked into the parking lot together and continued their conversation. Based upon the transcripts, which were not provided to the Court, all parties stipulated Shelton and Swafford were together talking in the parking lot when Shelton noticed the Nissan. The parties also stipulated the transcripts reflect Shelton asked Swafford, "How much iodine would you say you sell in an average week?" and Swafford responded, "Not much, just five cases."

### III. Analysis

Defendants move to suppress "any and all evidence resulting from or traceable to" the events of Shelton's first visit to JES/Broadway on October 4, 2004 [Doc. No. 111 at 1]. The defendants argue the contact with Swafford, and particularly his response to Shelton's inquiry about the amount of iodine sold is the reason why all three stops at issue took place and should be suppressed. As noted, both at the January 23, 2006 hearing and in its response to Swafford's motion to suppress, the government has conceded, in light of the Court's previous ruling on the initial motion to suppress, incriminating statements obtained by Shelton during his conversation with Swafford on October 4, 2004 cannot be used against defendants at trial in the government's case-in-chief [Doc. No. 123 at 2]. However, the government asserts it intends to proceed on Counts Twenty-One and Forty of the Superseding Indictment, the counts charging violations of the law by defendants on or about September 30, 2004, which the government contends includes evidence gained from the stops at issue on October 4, 2004.

The Sixth Amendment to the United States Constitution provides, "[i]n all criminal

6

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. This right to counsel attaches after "adversary judicial proceedings" have been initiated, which the United States Supreme Court has defined to include an indictment. *See United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682 (1972)). Once the Sixth Amendment right to counsel has attached for a particular charge, law enforcement officials may not use as evidence incriminating statements deliberately elicited from the accused without the presence or waiver of counsel. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Swafford and JES/Broadway assert the three vehicle stops on October 4, 2004, and all evidence resulting therefrom should be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). "[O]nce formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." *United States v. Feliz*, 20 F. Supp. 2d 97, 106 (D. Me. 1998) (citing *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)). The Sixth Amendment right to counsel attaches when a defendant has been indicted. *Id.* at n.14 (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)). The "appropriate remedy for a violation of *Massiah* includes not only suppression of all evidence directly obtained through governmental misconduct but also suppression of all evidence that can properly be designated the fruits of that conduct." *United States v. Kimball*, 884 F.2d 1274, 1278-79 (9th Cir. 1989).

"The fruit of the poisonous tree doctrine, developed in *Wong Sun v. United States*, 371 U.S. 471 (1983), has been applied to violations of the Sixth Amendment as well as to those of the Fourth Amendment." *Feliz*, 20 F. Supp. 2d at 106 (citing *United States v. Wade*, 388 U.S. 218, 241 (1967));

7

*United States v. Reyes*, 934 F. Supp. 546, 550 (S.D.N.Y. 1996) (quoting *Nix v. Williams*, 467 U.S. 431 (1984)). All evidence acquired as the result of a *Massiah* violation is not fruit of the poisonous tree, but, "the more apt question in such a [situation] is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun*, 371 U.S. at 488) (quoting Maguire, *Evidence of Guilt*, 221 (1959)). *Accord Kimball*, 884 F.2d at 1279 ("in order for evidence to be suppressed as the fruit of a constitutional violation, the violation must at a minimum have been the "but for" cause of the discovery of the evidence"); *United States v. Townsend*, 138 F. Supp. 2d 968, 973 n.12 (the fruit of the poisonous tree doctrine "prohibits the introduction of derivative evidence, both tangible and testimonial, which is the product of the primary [illegally obtained] evidence, but the doctrine does not require suppression of the evidence, if the government proves the evidence was or would have been discovered . . . wholly independent of any constitutional violation").

"Once the right to counsel has attached, the government is under an 'affirmative obligation' to respect and preserve the accused's choice to seek this assistance, and the law enforcement authorities must take no action that 'circumvents, and thereby dilutes the protection afforded by the right to counsel.'" *United States v. Terzado-Madruga*, 897 F.2d 1099, 1109 (11th Cir. 1990) (quoting *Maine v. Moulton*, 474 U.S. 159 (1985)). In determining whether evidence acquired as the result of a violation of a defendant's constitutional rights is "inadmissible under the fruit of the poisonous tree doctrine, a court must decide if law enforcement officials obtained this evidence by exploiting the initial illegality or by sufficiently distinguishable methods." *United States v. Smith*, 386 F.3d 753, 763 (6th Cir. 2004) (citing *Brown v. Illinois*, 422 U.S. 590, 599 (1975); *Wong Sun*,

371 U.S. at 488; *United States v. Leake*, 95 F.3d 409, 411 (6th Cir. 1996)). "The exclusionary rule . . . extends beyond the direct products of police misconduct to evidence derived from the illegal conduct, or "fruit of the poisonous tree." *Terzado-Madruga*, 897 F.2d at 1112 (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Whether evidence has been obtained by sufficiently distinguishable methods so as not to constitute "fruit of the poisonous tree," will "turn[] on the application of three closely related but analytically distinct exceptions to the exclusionary rule." *Id.* at 1113. Evidence will be admissible "under the 'inevitable discovery' doctrine if it inevitably or ultimately would have been discovered by lawful means without reference to the police misconduct." *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Second, the evidence will be admissible under the "independent source" doctrine "if it derived from a lawful source independent of the illegal conduct." *Id.* (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). Third, the evidence will be admissible under the "attenuation" doctrine "if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint." *Id.* (citing *United States v. Ceccolini*, 435 U.S. 268, 273 (1978)).

The "'core rationale' of the [inevitable discovery exception] is to deter police misconduct by ensuring that the prosecution is not put in a better position than it would have been if no illegality had transpired . . ." *Id.* at 1114. In order for the inevitable discovery exception to apply the government must demonstrate with "demonstrated historical facts," that an "independent and untainted discovery would inevitably have occurred." *Id.* (quoting *Nix*, 467 U.S. at 445 n.5).

Under the "independent source" exception to the exclusionary rule, evidence will be admissible if the prosecution can show it derived from a lawful source unrelated to the illegal

9

conduct. *Id.* at 1115 (quoting *Silverthorne*, 251 U.S. at 392). The critical inquiry is "whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct." *Id.* (citing *Segura v. United States*, 468 U.S. 796, 805 (1984)).

The "attenuation" exception to the exclusionary rule applies primarily when the alleged fruit of the poisonous tree doctrine consists of the testimony of witnesses as opposed to tangible physical evidence. *Id.* at 1116. The "attenuation" doctrine recognizes the "illegality which led to the discovery of [a] witness very often will not play any meaningful part in the witness' willingness to testify." *Id.* (citing *Ceccolini*, 435 U.S. at 277).

If there was a violation of a defendant's Sixth Amendment right, then the government must prove the evidence which the defendant seeks to suppress is not "fruit of the poisonous tree" by demonstrating either the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the illegal conduct. *United States v. Martinez*, 356 F. Supp.2d 856, 870 (M.D. Tenn. 2005); *Murphy* v. *Kansas City, Mo.*, 347 F. Supp. 837, 862 (W.D. Mo. 1972).

### *The Stop of the Nissan Pickup*

Based upon the evidence adduced at the January 23, 2006 evidentiary hearing, I conclude testimony concerning the stop of the Nissan pickup and any evidence gathered as the result of the stop of the Nissan pickup on October 4, 2004 must be suppressed as "fruit of the poisonous tree." Although it is not certain what, if anything, Shelton said about the Nissan pickup truck or its driver beyond identifying the vehicle, it is clear he observed the Nissan pickup while he was present at the JES/Broadway premises and Shelton said something which brought the vehicle or its occupant to Farmer's attention. Moreover, the parties have stipulated Shelton observed the Nissan pickup while

10

he was speaking to Swafford. Thus, at the very minimum, Shelton's opportunity to observe the Nissan pickup and its driver is connected to his presence at the JES/Broadway premises on October 4, 2004 and is sufficiently connected to the underlying violation of Swafford's Sixth Amendment right to counsel to constitute "fruit of the poisonous tree." *Smith*, 386 F.3d at 763. The government has not demonstrated the stop of the Nissan pickup falls within any of the exceptions to the exclusionary rule. *Terzado-Madruga*, 897 F.2d at 1113.

Accordingly, I **RECOMMEND** the aspect of the defendants' motion to suppress which seeks to suppress testimony concerning the stop of the Nissan pickup truck on October 4, 2004, and any evidence gathered as a result of the stop, be **GRANTED**.

**The stop of the Ford F-100 pickup**

I conclude testimony concerning the stop of the Ford F-100 pickup on October 4, 2004, and any evidence seized as a result, need not be suppressed as "fruit of the poisonous tree." Farmer testified the stop of the Ford F-100 pickup truck was not in any way related to Shelton's presence at JES/Broadway or his conversation with Swafford. Farmer unequivocally testified the Nissan pickup truck was the only vehicle about which he overheard Shelton make any comment. He further testified the stop of the F-100 pickup truck was made sometime after Shelton had left the JES/Broadway premises, and was based upon observations of the driver of the pickup truck by law enforcement officers. Farmer specifically testified the Ford F-100 pickup truck was stopped based upon "the MO" of the driver of the vehicle. It appears the decision to stop the Ford F-100 pickup truck was derived not from the result of Shelton's presence at JES/Broadway on October 4, 2004 or from any statements Swafford made to Shelton, but from an "independent source," the observations made by law enforcement about a customer who arrived at JES/Broadway after Shelton

11

had left. *Silverthorne*, 251 U. S. at 392.

The mere surveillance of the JES/Broadway premises after Shelton had left is not a violation of Swafford's or JES/Broadway's Sixth Amendment right to counsel. In order to make out a Sixth Amendment violation concerning testimony, a defendant must demonstrate "'the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.'" *United States v. Cook*, 2005 WL 1429303, * 12 (E.D. Tenn. February 11, 2005) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986)). The mere surveillance of the JES/Broadway parking lot and premises after Shelton had left, was not in and of itself an act on the part of law enforcement designed to deliberately elicit incriminating statements.

Thus, the stop of the Ford F-100 pickup truck was sufficiently unrelated to Shelton's presence at the JES/Broadway premises and conversation with Swafford on October 4, 2004, that it does not constitute "fruit of the poisonous tree." *See Smith*, 386 F.3d at 763. More specifically, the stop stemmed from an independent source; namely the observations of law enforcement officers after Shelton had left the scene. As the stop of the Ford F-100 pickup truck falls within the independent source exception to the exclusionary rule, it does not constitute "fruit of the poisonous tree." *Terzado-Madruga*, 897 F.2d at 1113. Under these circumstances, the government has met its burden to prove the evidence from the Ford F-100 pickup truck stop is not "fruit of the poisonous tree" by demonstrating the evidence was discovered through independent means. *See Martinez*, 356 at 870.

Accordingly, I **RECOMMEND** the aspect of the defendants' motion to suppress which seeks to suppress testimony concerning the stop of the Ford F-100 pickup on October 4, 2004 and any evidence gathered as a result the stop be **DENIED**.

### *The stop of the Chevrolet Camaro*

The issue of suppression with respect to the stop of the Chevrolet Camaro is a closer call. I conclude testimony concerning the stop of the Camaro on October 4, 2004, and any evidence seized as a result, need not be suppressed as "fruit of the poisonous tree." Farmer's testimony shows the stop of the Camaro was unrelated to Shelton's presence at JES/Broadway or any statements made by Swafford to Shelton. Law enforcement officers followed the Camaro after it left the JES/Broadway premises. Farmer testified iodine was in plain view in the back hatch of the Camaro, although his testimony does not indicate when the iodine was first observed. Further, as Farmer, who monitored the wire worn by Shelton, was not involved in the stop of the Camaro, there is not a scintilla of evidence the stop of the vehicle was in any way related to Swafford's comment to Shelton about the quantity of iodine he sold on a weekly basis. Under these circumstances, the government has met its burden to prove the evidence from the Camaro stop is not "fruit of the poisonous tree" by demonstrating the evidence was discovered through independent means or was so attenuated from the illegality as to dissipate the taint of the illegal conduct. *See Martinez*, 356 at 870.

Accordingly, I **RECOMMEND** the aspect of the defendants' motion to suppress which seeks to suppress testimony concerning the stop of the Camaro on October 4, 2004, and any evidence gathered as a result of the stop, be **DENIED**.

IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED** the defendants' motion to suppress [Doc. No. 111] be **GRANTED IN PART** and **DENIED IN PART** as follows:[3]

(1) Evidence concerning the stop of the Nissan pickup truck on October 4, 2004, and any evidence gathered as a result of the stop, **be suppressed**;

(2) Evidence concerning the stop of the Ford F-100 pickup truck on October 4, 2004, and any evidence gathered as a result of the stop, **not be suppressed**; and,

(3) Evidence concerning the stop of the Chevrolet Camaro on October 4, 2004, and any evidence gathered as a result of the stop, **not be suppressed**.

                                             s/Susan K. Lee
                                             SUSAN K. LEE
                                             UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

14