UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA,    )
    )
    Plaintiff    )
    )    No. 1:04-CR-138-1
v.    )
    )    Chief Judge Curtis L. Collier
JOSEPH SWAFFORD,    )
    )
    Defendant.    )

## MEMORANDUM AND ORDER

On November 20, 2008, the Court held its resentencing hearing in this case.[1]  Defendant

Joseph Swafford had previously been sentenced to 360 months following his conviction, after a jury

trial, for charges stemming from his supply of iodine to others to manufacture methamphetamine

(Court File No. 189).  As a result of Defendant's appeal, the two conspiracy charges against him

were overturned.  *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008).  Additionally, the

charges on which he was convicted under 18 U.S.C. § 843(a)(6) were merged into the charges on

which he was convicted under 18 U.S.C. § 841(c)(2).  *Swafford*, 512 F.3d at 846.  On remand by the

United States Court of Appeals for the Sixth Circuit for resentencing, Defendant filed a sentencing

memorandum and objection to the Presentence Report ("PSR") (Court File No. 235).  After the

Court set Defendant's resentencing for September 4, 2008 (Court File No. 237), Defendant filed a

motion for downward departure and/or variance (Court File No. 239) and an objection to the revised

---

[1]This hearing was continued from Defendant's resentencing hearing on September 4, 2008, which was suspended because Defendant's counsel indicated he had a petition for writ of certiorari from the Sixth Circuit's decision pending in the United States Supreme Court.  That petition was denied on October 6, 2008. *Swafford v. United States*, 129 S. Ct. 329 (2008).

1

PSR (Court File No. 240). After his certiorari petition was denied, Defendant also filed a supplemental objection to the revised PSR (Court File No. 246). The Government has filed responses to all but the last of Defendant's objections. The Court has taken all these filings into account in reaching its resentencing decision.

The Guideline range applicable to Defendant is 292 to 365 months. The Court is required to explain the reasons for its sentence. 18 U.S.C. § 3553(c). This memorandum will elaborate upon the reasons stated at the time of the imposition of sentence.

## I.    SENTENCING METHODOLOGY

This Court explained its sentencing methodology in a previous case, *United States v. McElheney*, 524 F. Supp. 2d 983 (E.D. Tenn. 2007). There, the Court noted it considers the sentencing range set by the United States Sentencing Guidelines ("USSG" or "Guidelines"), but treats the Guidelines range only as advisory after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and may tailor the sentence in light of other statutory concerns. 524 F. Supp. 2d at 986. *McElheney* reaffirmed an earlier statement of the Court's sentencing practices found in *United States v. Phelps*, 366 F. Supp. 2d 580 (E.D. Tenn. 2005), where the Court explained it would be guided by 18 U.S.C. § 3553(a) and "will impose a sentence in each case which is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate specific and general deterrence, and provide the defendant with needed training, case, or treatment in the most effective manner." *McElhaney*, 524 F. Supp. 2d at 986 (quoting *Phelps*, 366 F. Supp. 2d at 593). Further, *McElhaney* held *Phelps* was squarely in line with later Sixth Circuit precedent interpreting *Booker*, such as *United States v.*

2

*Buchanan*, 449 F.3d 731 (6th Cir. 2006), and *United States v. Williams*, 436 F.3d 706 (6th Cir. 2006). *McElhaney*, 524 F. Supp. 2d at 987–88.

The Court's sentencing methodology set forth in *McElheney* warrants an update in light of more recent Supreme Court holdings in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007). *Kimbrough* involved a defendant's challenge, at his sentencing hearing, to the application of the 100-to-1 crack cocaine-to-powder cocaine sentencing disparity. The district judge, taking into account the "nature and circumstances" of the offense and the defendant's "history and characteristics," found the proposed sentence would have been "greater than necessary" to accomplish the purposes of sentencing in § 3553(a), and sentenced the defendant to a term significantly below the suggested Guidelines range. 128 S. Ct. at 565. The Supreme Court upheld the sentence, holding the sentencing judge must give "respectful consideration" to the Guidelines, but may tailor the sentence in light of other considerations. *Id.* at 570 (citing *Booker*, 543 U.S. at 245–46). That is, in pronouncing judgment, a judge "must include the Guidelines range in the array of factors warranting consideration. The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Id.* at 564.

*Gall* further elucidated how a sentencing court should approach the Guidelines' application: "[T]he Guidelines should be the starting point and the initial benchmark." 128 S. Ct. at 596. However, the Guidelines are not the only consideration, and the sentencing judge must consider all the factors in § 3553(a) to see whether they support the sentence requested by a party. *Id.* The sentencing judge may not presume the Guidelines range is reasonable, but must instead make a fact-based individual assessment. *Id.* at 596–97. Finally, "[a]fter settling on the appropriate sentence,

3

[the judge] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 597 (citing *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007)).

This Court follows the instruction of *Gall* and *Kimbrough*: in sentencing, it will start by considering the Guidelines range, but will also take into account all the § 3553(a) factors to determine whether a suggested sentence is appropriate. As it did in *McElhaney*, 524 F. Supp. 2d at 987–88, the Court explains this methodology is in line with Sixth Circuit law interpreting the latest sentencing cases. In *United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008), the Sixth Circuit made clear "*Gall* shows that the sentencing process involves an exercise in judgment, not a mathematical proof." *Grossman* approved the now-familiar process a district court must employ in sentencing: "properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors and adequately explain the chosen sentence." *Id.* at 595 (citing *Gall*, 128 S. Ct. at 597). Lastly, the district court's sentence will be reviewed under the deferential abuse of discretion standard. *Id.* at 596; *Gall*, 128 S. Ct. at 591.

With the foregoing law in mind, the Court turns to an analysis of the factors it used in calculating Defendant's sentence.

## II. DISCUSSION

### A. Nature and Circumstances of the Offense

#### 1. Counts of Conviction

Defendant was charged in a forty-count superseding indictment on February 24, 2005 (Court File No. 23). Count One alleged Defendant conspired to violate 21 U.S.C. §§ 841(a)(1) and

(b)(1)(a) by knowingly, intentionally, and without authority aiding and abetting the manufacture of 500 grams or more of methamphetamine (*id.*). Count Two alleged Defendant conspired to violate 21 U.S.C. § 841(c) by knowingly, intentionally, and without authority distributing iodine, knowing and having reasonable cause to believe it would be used to methamphetamine (*id.*). Counts Three through Twenty-One alleged Defendant violated 21 U.S.C. § 841(c)(1) by possessing equipment, chemicals, products, and materials which may be used to manufacture methamphetamine (*id.*). Counts Twenty-Two through Forty alleged Defendant violated 21 U.S.C. § 841(c)(2) by knowingly, intentionally, and without authority distributing iodine, knowing and having reasonable cause to believe it would be used to manufacture methamphetamine (*id.*). A jury found Defendant guilty on all counts (Court File No. 169).

## 2. Other Offense-Related and Relevant Conduct

Following remand from the Sixth Circuit, the United States Probation Office prepared a revised PSR[2] which detailed Defendant's conduct giving rise to his base offense level. As the owner and manager of Broadway Home and Garden in Chattanooga, Defendant began selling iodine in large amounts to several individuals for the purpose of manufacturing methamphetamine. PSR ¶ 9. It appeared Defendant began selling iodine because of competition his hardware business faced from larger retailers. As his legitimate business declined, he sold increasing amounts of iodine. PSR ¶¶ 9–10. His pattern of distribution began around August 2001 and continued until approximately October 2004. PSR ¶¶ 9, 21. Evidence during trial revealed, and the PSR reiterated, that Defendant purchased at least 2,400 gallons and 5,707 pints of liquid iodine from different suppliers in order to distribute it to methamphetamine producers. The PSR used a final figure of

---

[2]Unless otherwise stated, all references in this opinion are to the revised PSR.

5

3,113 gallons of iodine to calculate Defendant's offense level. The PSR calculated 424 kilograms (over 925 pounds) of methamphetamine could be produced from the iodine Defendant supplied. PSR ¶ 24.

Defendant sold iodine to methamphetamine cooks in varying quantities and with varying frequency. He sold the iodine as flakes, BBs, and in liquid form. According to Drug Enforcement Administration ("DEA") officials, iodine flakes and BBs are better than liquid iodine and convert to 100% pure iodine. He sold five pounds of iodine BBs to one cook for $800, PSR ¶ 19; to another, he sold 18 pounds of iodine for $3,500 on one of the several occasions they met. PSR ¶ 20. Other cooks testified they would purchase iodine from Defendant on a weekly basis. PSR ¶ 18. All told, Defendant's sale of iodine netted him over $45,000 cash. PSR ¶ 22.

Defendant's conduct made clear he knew law enforcement was investigating his activities. He accepted only cash for iodine purchases, yet took credit cards and checks for purchases other than iodine. PSR ¶ 19. He instructed one customer to withhold payment until another customer, whom he suspected of being a law enforcement official, left the store. PSR ¶ 12. One of the several methamphetamine cookers who bought iodine from Defendant testified that on one occasion when no iodine was available, Defendant pointed to a piece of paper with a law enforcement insignia on it as explanation. PSR ¶ 11. Defendant had also been warned on at least one occasion by law enforcement to be alert for those displaying symptoms of methamphetamine addiction, and not to sell methamphetamine ingredients repeatedly to the same individual. PSR ¶ 16.

Defendant attempted to lend an appearance of legitimacy to his iodine sales by asserting such sales were for legitimate purposes. As an example, Defendant would readily provide iodine if told it would be used for horses. PSR ¶ 10. Iodine can apparently be used to treat equine disorders such

6

as abscesses or bleeding; however, experts testified only a small amount—no more than two ounces—of iodine would suffice to treat several horses over several years. PSR ¶ 13. In contrast, Defendant supplied 3,113 gallons of iodine over a relatively short period for methamphetamine production before he was caught. PSR ¶ 24.

On October 4, 2004, Defendant was arrested in his store after confessing to a DEA agent that he sold about five cases of liquid iodine a week, though he limited customers to two pints. PSR ¶ 21. At trial, he denied selling iodine for the production of methamphetamine, and also denied meeting a certain methamphetamine cook for the purpose of selling iodine to him. PSR ¶ 24. Defendant was convicted on all counts at trial (Court File No. 189). Following his appeal, he comes before this Court for resentencing on Counts 22 through 40.

### B.    Defendant's History and Characteristics

Defendant did not submit letters to the Court nor provide specific personal information in his sentencing memorandum, so the Court relies on the information in the PSR. Defendant is a 64 year old Caucasian male, in fair physical health, with no mental or emotional health problems or treatment. PSR ¶¶ 48–50. His father is deceased; his mother and brother both reside in the Chattanooga area. PSR ¶ 44. He describes having a normal childhood. PSR ¶ 45. He has been married for 37 years and has one daughter. PSR ¶ 46. He received a bachelor's degree in business administration majoring in accounting. PSR ¶ 52. Defendant has spent his whole life in the Chattanooga area with the exception of two years in the United States Army. PSR ¶ 45.

Defendant's sentencing memorandum does reiterate a few of these characteristics (Court File No. 235), which are relevant insofar as they impact the Court's decision in imposing Defendant's sentence. However, the sentencing memorandum adds nothing new except to point out Defendant

has lost his business and source of income as a result of his conviction (*id.*).

### C. Calculation of Guidelines

#### 1. Guidelines Calculation in PSR

The 2007 edition of the United States Sentencing Guidelines was used in calculating Defendant's Guidelines sentence. Defendant was found guilty of violating 19 counts of 21 U.S.C. § 841(c)(2), the relevant Guidelines provision for which is found in USSG § 2D1.11. Because Defendant sold what amounted to 3,113 gallons of iodine, the base offense level under § 2D1.11(e)(2) would be 28. However, because Defendant's offense involved unlawfully manufacturing methamphetamine, in that the evidence clearly pointed to his knowingly supplying iodine to methamphetamine manufacturers, the cross reference provision of USSG § 2D1.11(c) must be applied. Accordingly, under USSG § 2D1.1(c)(1), Defendant's supplying iodine used to manufacture at least 424 kilograms of a methamphetamine mixture leads to a base offense level of 38. PSR ¶ 30.

Two points were added to this calculation because Defendant obstructed justice by giving false testimony and statements under oath, in that he denied selling iodine for the production of methamphetamine and denied meeting a known methamphetamine cook. PSR ¶¶ 24, 34. Defendant did not make any statements indicating an acceptance of responsibility, so this adjustment was unavailable. PSR ¶ 36. Defendant did not have any prior convictions, so he received zero criminal history points and a criminal history category of I. PSR ¶ 43. The resulting Guidelines range is 292 to 365 months. Under 21 U.S.C. § 841(c), the maximum term of imprisonment for each of Counts 22 through 40 is ten years. Pursuant to 18 U.S.C. § 3571(b)(3), the maximum fine for each of Counts 22 through 40 is $250,000, totaling $4,750,000. Under 18 U.S.C. § 3583(b)(2), the Court

may impose a term of supervised release of not more than three years, all such terms to run concurrently under 18 U.S.C. § 3624(e).

## 2.    Defendant's Objections to the Guidelines Calculation

### a.    Incorrect Statutory Maximum

Defendant objects that the original PSR contained an incorrect calculation of the statutory maximum for violating 21 U.S.C. § 841(c)(2), which should have been set at 10 years, not 20 as in the PSR (Court File No. 235).  Defendant is correct, a point which the Government concedes (*id.*). Accordingly, the Court has used the 10 year statutory maximum in considering Defendant's sentence.

### b.    Application of the USSG § 2D1.11(c) Cross Reference

Defendant next challenges the PSR's application of the cross reference provision in USSG § 2D1.11(c) to calculate his base offense level based on the table in USSG § 2D1.1.  The cross reference directs that "if the offense involved unlawfully manufacturing a controlled substance, or attempting to manufacture a controlled substance unlawfully, apply §2D1.1 (Unlawful Manufacturing, Importing, Exporting, Trafficking) if the resulting offense level is greater than that determined above."  USSG § 2D1.11(c) (2007).  Based on the cross-reference and given that Defendant enabled the production of methamphetamine equivalent to 424 kilograms, the revised PSR set Defendant's base offense level at 38.

In its opinion, the Sixth Circuit noted Defendant's base offense level could be different on remand because

> [t]he single conspiracy convictions allowed the government to attribute all of the defendant's iodine sales to the production of methamphetamine.  This quantity . . . informed the applicable guidelines sentencing range.  Had the government been required to prove each of the multiple conspiracies, the amount of iodine/methamphetamine—and the attendant

9

guidelines range—may very well have been lower.

*Swafford*, 512 F.3d at 844 n.5. Defendant argues because the conspiracy convictions in the case no longer exist, application of the cross-reference is no longer supported (Court File No. 240).

The Court must reject Defendant's argument. On its face, the cross reference contains no conspiracy requirement, and Counts 22–40 still involve the unlawful manufacture of a controlled substance, which is the triggering language for the cross reference. Defendant notes "the term 'conspiracy' is absent" from § 2D1.11(c), though this actually cuts against him—the cross reference would still be in effect whether or not a conspiracy exists. The controlling language is whether the offense "*involved* unlawfully manufacturing a controlled substance, or attempting to manufacture a controlled substance unlawfully" (emphasis added), and counts 22–40 included an element of manufacturing methamphetamine. Put another way, it does not matter whether Defendant was engaged in one conspiracy with all the methamphetamine cookers charged along with him, many conspiracies with each one, or no conspiracy at all.[3] The key is that Defendant was supplying iodine to people when he knew it was intended for methamphetamine use, and he had been repeatedly warned of this by the Government.

Implicit in Defendant's argument is that he was not "involved" enough in the production of methamphetamine sufficient to satisfy the cross reference's requirement. "Involved" is defined in the Guidelines as follows: "'Offense involved unlawfully manufacturing a controlled substance or attempting to manufacture a controlled substance unlawfully,' as used in subsection (c)(1), means

---

[3]Even if a single conspiracy did not exist, the Sixth Circuit still upheld the existence of multiple conspiracies. "[T]he evidence proved at this trial demonstrated the existence of multiple conspiracies between the defendant and many of the Broadway customers who testified." *Swafford*, 512 F.3d at 842. That is, Defendant had entered into agreements with several people, the object of which was to manufacture methamphetamine with the iodine Defendant was distributing.

10

that the defendant, or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct), completed the actions sufficient to constitute the offense of unlawfully manufacturing a controlled substance or attempting to manufacture a controlled substance unlawfully." USSG § 1.11 cmt. n.2 (2007). The section on Relevant Conduct holds a defendant accountable for an offense for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." USSG § 1B1.3(a)(1)(A) (2007).

While there is little to no published law specifically on this point, cases have held the distribution of precursor chemicals to "involve" the manufacturing of methamphetamine. *See United States v. West*, 257 F. App'x 76, 79 (10th Cir. 2007) (using the cross reference where the defendant knowingly provided iodine to a neighbor, who then cooked methamphetamine); *United States v. Coale*, 144 F.App'x 770, 774 (11th Cir. 2005) (in the identical cross reference provision for possession of methamphetamine lab equipment, the court applied the cross reference, calculating the offense level based upon the amount of methamphetamine, even when the manufacturing of methamphetamine was not an element of the convicted offense). In *Coale*, the court considered all the surrounding factors indicating defendant's involvement in the methamphetamine manufacturing to determine whether calculating the offense guideline based upon the methamphetamine amount, rather than the equipment possessed, was appropriate. *Coale*, 144 F. App'x at 774. Here, the Court applies a similar analysis to that in *Coale* by looking at the totality of Defendant's offense conduct. Defendant was convicted of knowingly distributing iodine to be used for methamphetamine production. The frequency of his contacts with methamphetamine cooks, his cash profits, and the quantities of iodine sold all indicate Defendant knew the iodine would be used for methamphetamine

11

production, not for licit purposes such as the treatment of equine injuries. The Court cannot accept Defendant's argument that he was not involved in the production of methamphetamine when he supplied large-scale quantities of iodine under those circumstances.[4]

Furthermore, this Court may punish, as relevant conduct, those criminal activities linked to the crime of conviction which are proved at sentencing by a preponderance of evidence. *United States v. Conway*, 513 F.3d 640, 643 (6th Cir. 2008). The Government bears the burden of proof, by preponderance of evidence, that a defendant's criminal activities constitute relevant conduct. *United States v. Phillips*, 516 F.3d 479, 483 (6th Cir. 2008). Here, after considering evidence at the sentencing and resentencing hearings, the Court finds the Government has met its burden and has demonstrated, by a preponderance of evidence, that all the iodine used by the other defendants in manufacturing methamphetamine could be attributed to Defendant.

Defendant argues further that he conducted a LexisNexis search for cases in which the cross-reference is mentioned, and no cases applied the cross-reference "except where the Defendant personally was found to be in possession of a meth lab, or a partial one, or multiple ingredients together with lab hardware or a recipe for cooking the illicit drug" (Court File No. 240). Except

---

[4]Defendant's situation differs from that of the less culpable iodine supplier who fails to comply with regulatory requirements governing the distribution of iodine. If Defendant had merely illegally sold iodine—say, by not completing the appropriate paperwork or precautions for selling a listed drug—he would not be charged with knowing distribution to be used to produce methamphetamine, but rather unlawful distribution. Indeed, the Guidelines provide a three-level decrease where a person was unaware of the listed chemicals' ultimate use to produce methamphetamine. *See* § 2D1.11(b)(2); *see also id.* cmt. n.5 ("In a case in which the defendant possessed or distributed the listed chemical without such knowledge or belief, a 3-level reduction is provided to reflect that the defendant is less culpable than one who possessed or distributed listed chemicals knowing or believing that they would be used to manufacture a controlled substance unlawfully."). That is, a defendant must knowingly be supplying the iodine for methamphetamine production to receive the cross reference.

12

possibly for *United States v. Foley*, 23 F.3d 408, 1994 WL 144445 (6th Cir. 1994) (unpublished table opinion), however, none of the cases Defendant lists is binding on this Court. Defendant distinguishes *Foley* because it involved a conviction under 21 U.S.C. § 841(a) (distributing or possessing a controlled substance, not a precursor chemical), thus "obviously" triggering the cross-reference. While this is true, it certainly does not militate *against* applying the cross-reference to Defendant. As discussed above, taking into account all of Defendant's offense conduct, there is more than enough evidence Defendant knew the iodine would be used to manufacture methamphetamine, satisfying the involvement requirement of the cross-reference. Defendant cannot argue he should receive a more lenient sentence merely because this Court has not applied the cross-reference in this specific context before. The Court must consider each defendant's individual characteristics and circumstances surrounding the offense. Here, the quantities of iodine sold by defendant to fuel methamphetamine production justify the court in using the § 2D1.11(c) cross reference, and accordingly, the Court has denied Defendant's objection to it.

### c. Principle of Lenity

Defendant asserts the principle of lenity prevents the government from using the cross reference in USSG § 2D1.11(c), as well as the provision in § 5G1.2 governing sentencing on multiple counts of conviction. Under the principle of lenity, "where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *United States v. Bass*, 404 U.S. 336, 348 (1971). It applies "when, but only when, after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute." *United States v. Marek*, 238 F.3d 310, 322 (5th Cir. 2001) (en banc). The purpose behind the rule is that "no individual [should] be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100

(1979). Here, Defendant points to no ambiguity in the language of the cross-reference or § 5G1.2(d) beyond arguing against the cross-reference's application. "Although we do apply the rule of lenity to matters relating to the sentencing guidelines . . . the rule of lenity is generally inapplicable unless, after a court has seized on every thing from which aid can be derived, it is still left with an ambiguity." *United States v. Hudspeth*, 208 F.3d 537, 539 (6th Cir. 2000). The Court finds no ambiguities in the language of either the cross reference or § 5G1.2, and accordingly, Defendant's lenity argument must fail.

Furthermore, § 5G1.2 does not prohibit the Court from imposing consecutive sentences in order to reach the total punishment determined by the combined length of sentences. Under § 5G1.2's "total punishment" concept, "a district court is required to sentence consecutively up to the lower limit of the applicable sentencing range [and then may] sentence consecutively up to the upper limit of the range." *Jenkins v. United States*, 394 F.3d 407, 412 (6th Cir. 2005). "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." USSG § 5G1.2(d) (2007).

Therefore, the Court denies Defendant's objection based on the principle of lenity.

### d.    Defendant's Minor or Mitigating Role

Defendant argues he is eligible for a two or four-level reduction in his base offense level under USSG § 3B1.2 because he played only a minor or mitigating role in the distribution of iodine (Court File No. 240). He cites Application Note 3(A) to this provision, which requires a defendant to have been "substantially less culpable than the average participant." As his offense conduct

14

demonstrated, Defendant was more culpable than the average participant, as he supplied substantial quantities of iodine to multiple customers over a period of several years. Nor was Defendant convicted of a significantly less serious offense under Application Note 3(B) (which normally does not result in a reduction anyway). "[T]he Court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." USSG § 3B1.2 cmt. n.3(C) (2007). Given that Defendant supplied massive quantities of iodine which could be used to manufacture methamphetamine, the Court has denied Defendant's request for a minimal or minor participant reduction under USSG § 3B1.2.

### e. Defendant's Equitable Considerations

Lastly, Defendant objects to the revised PSR and seeks a shorter sentence on several equitable grounds (Court File No. 235). He notes he is 64 years old and has forfeited the assets from his business to the government (*id.*). He is presently earning no income and does not expect to earn above a subsistence level for the rest of his life (*id.*). Because he is older and cannot run his business anymore, he is a low risk to reoffend (*id.*). Defendant notes he served his country honorably in the Army and already faces retribution in the form of a prison sentence (*id.*). These factors, argues Defendant, ought to mitigate any sentence imposed by this Court.

The Court has considered the factors Defendant presents, and is sympathetic to Defendant's age and financial position. However, as the Court made clear at Defendant's first sentencing hearing, Defendant's time in prison is driven by a need for just punishment and deterrence given the unprecedented quantities of iodine Defendant sold. Defendant made the conscious decision to sell this iodine, putting numerous people at risk of harm and causing harm directly to others. Thus, while the Court has considered Defendant's equitable factors in determining his within-Guidelines

sentence, the factors do not rebut the offense conduct in which Defendant participated, or give rise to a below-Guidelines sentence.

Having dealt with these considerations, the Court finds the revised PSR accurately calculates the Guideline range.

### 3. Motion for Departure or Variance from the Guidelines

Prior to sentencing, Defendant made a conditional motion for a downward departure and/or variance (Court File No. 239). As justification, he restated the equitable concerns he raised prior to the revised PSR's filing (age, loss of business, low recidivism risk, and low income), and which the Court discussed above. Yet though these factors are relevant and the Court has taken them into account in assigning Defendant's sentence within the Guidelines range, they do not rebut the need for just punishment and deterrence based on the unprecedented amount of iodine Defendant sold. Defendant also cites the disparity in sentence lengths between him and others convicted of violating 21 U.S.C. § 841(c). Again, the fact other courts have not imposed so lengthy a sentence does not save Defendant here, particularly where the defendants in those cases were involved with far smaller quantities of predicate substances. Lastly, Defendant argues for a departure or variance because law enforcement "delayed for years in stopping the sales giving rise to the charges." At Defendant's first sentencing hearing, the Court addressed the Government's questionable conduct and observed that several jurors had expressed their concerns about the length of time the Government used to bring charges against Defendant. However, at the same sentencing hearing, the Court held such tactics do not justify Defendant's behavior or the harm he caused the community. The same holds true at the present sentencing. As Defendant cites no other § 3553(a) or USSG Chapters 4 and 5 factors justifying a variance or departure, the Court has denied this motion.

16

### 4.   Application of § 3553(a) Factors

The Court has determined the appropriate sentence pursuant to the directions set out in 18

U.S.C. § 3553(a).  The Court has endeavored to reach a sentence which satisfies the needs identified

in 18 U.S.C. § 3553(a)(2) and the unique history and characteristics of Defendant.

### a.   Need of Sentence to Reflect Seriousness of the Offense, to Promote  Respect for the Law, and to Provide Just Punishment

The first factor in § 3553(a)(2) identifies the retributive function of sentencing.  An

appropriate sentence should serve to impress upon both the defendant and society at large that the

conduct of the defendant is viewed as reprehensible and that such conduct cannot be tolerated.  The

sentence should serve to promote respect for the law.  And the sentence should provide just

punishment for the particular conduct.

As the Court stated in *Phelps*, the Court generally will defer to the judgment of Congress and

the Sentencing Commission on this point:

> The Guidelines and policy statements also reflect the considered judgment of
> Congress and the Sentencing Commission as to the weight and relevance of certain
> generalized criteria in criminal sentencing. Not only are these entities more
> representative than this Court of the various stakeholders in criminal sentencing
> (including perhaps most significantly the general citizenry), but they are also in a
> better position to offer judgments as to the presence and extent of certain traditional
> sentencing considerations with respect to classes of offenses and/or offenders. For
> example, it would be quite difficult if not a practical impossibility for the Court or
> the federal judiciary in general to evaluate and assess the need "to afford adequate
> deterrence to criminal conduct" ( *i.e.*, general deterrence) in the context of any given
> statutory offense.  It is neither the purpose nor the province of the federal judiciary
> to gather evidence, hear testimony, and come to conclusions as to such matters, nor
> is it this Court's desire to do so.  Additionally, with respect to § 3553(a)(2)(A)'s call
> for sentences which reflect the seriousness of the offense, promote respect for the
> law, and provide just punishment, the conclusions of Congress and the Sentencing
> Commission are a much more accurate and consistent (though still imperfect)
> barometer of the present societal consensus as to these broadly phrased objectives
> of criminal sentencing than the subjective opinions of this Court on any given day
> could ever hope to be. Finally, because the nation's district courts are presided over

by hundreds of judges sitting in different locales and each operating from their own individual professional and personal backgrounds and experiences, the only feasible way to provide any meaningful uniformity in federal sentencing, as called for in § 3553(a)(6), is for this Court and others to give the advisory Guidelines some degree of enhanced weight in determining a fair, just, and reasonable sentence in a given case.

*Phelps*, 366 F. Supp. 2d at 588–89 (internal citations omitted).

In considering the need of a sentence to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment, the Court will look to the nature of the offense of conviction. Methamphetamine is a drug which has increased in popularity in recent decades, and has several long-term health effects for users, including addiction, violent behavior, anxiety, confusion, and insomnia. *See* U.S. Drug Enforcement Agency, DEA, Drug Information, Methamphetamine, http://www.usdoj.gov/dea/concern/meth.html (last visited Nov. 19, 2008). Methamphetamine's prevalence in southeast Tennessee has posed a challenge to law enforcement at the beginning of the twenty-first century. *See* Jacqueline Koch, *Meth Lab Seizures Decline in Tennessee; Fight Continues*, Chattanooga Times/Free Press, Apr. 3, 2008 (pointing to clandestine manufacturing operations which are difficult to detect even as the number of lab seizures has dropped). The problem of methamphetamine manufacture is compounded by the relatively easy availability of its predicate ingredients. The three main ingredients of phosphorous, iodine, and ephedrine can all be obtained from commercially available sources; pseudoephedrine-containing Sudafed is a common nasal congestion remedy.

Additionally, the production of methamphetamine is quite risky. Aside from the effects on those consuming the drug, methamphetamine labs explode, killing the cooks and innocent bystanders, including children. Even when there are no explosions, those children are often exposed to noxious fumes. These dangers warrant tough penalties for those who knowingly facilitate these

18

dangers. *See United States v. Brain*, 226 F. App'x 511, 514–15 (6th Cir. 2007) (discussing the inherent dangers of methamphetamine production and the intent of Congress to counteract those dangers via the Methamphetamine Anti-Proliferation Act of 2000); *United States v. Layne*, 324 F.3d 464, 470 (6th Cir. 2003) ("Certain of the chemicals used in th[e] process are toxic and inherently dangerous. During the manufacturing process, some of these chemicals, which are highly flammable, present a threat of explosion. These chemicals pose an additional risk should anything go wrong during the manufacturing process. The process produces toxic gases, which pose a serious risk to those who inhale them, and other dangerous byproducts.").

Under § 3553(a), the Court must assign consequences that correspond to the blameworthiness of a defendant's behavior. As his offense conduct shows, Defendant supplied massive amounts of iodine to many buyers, generating substantial sales, over a long period, leading to the manufacture of great quantities of methamphetamine. This type of behavior is precisely what Congress targeted when it passed laws against methamphetamine production, and serious consequences are demanded for breaking those laws.

**b.       Need of Sentence to Afford Adequate Deterrence**

The second factor identifies the deterrent function of sentencing. An appropriate sentence should serve to deter others who might be inclined to commit similar offenses. Such would-be offenders should add the risk of incarceration to their calculation when contemplating whether to engage in this type of conduct. This is also a function for which the Court is not as well equipped as Congress and the Sentencing Commission in determining what precise sentence will deter those in the general public inclined to commit such offenses. *Phelps*, 366 F. Supp. 2d at 588.

As the Court discussed above, the precursor ingredients to methamphetamine are relatively

19

easy to obtain from commercial sources. When people discover they can supply these products with ease, and can command a high price for them because of their restricted nature, they are more likely to sell the basic ingredients for methamphetamine to potential manufacturers and cooks. On the other hand, when people learn there are strong penalties for supplying methamphetamine ingredients, they choose not to sell them and the market for methamphetamine diminishes. In Defendant's case, even the threat of discovery by law enforcement was not sufficient to deter him from selling iodine to methamphetamine cooks for three years. Defendant's fellow citizens must not be tempted by the easy availability of methamphetamine's ingredients; they must know serious consequences will ensue if they supply precursor substances.

> ### c. Need of Sentence to Protect the Public from Further Crimes of the Defendant

The third factor identifies the incapacitative function of sentencing. An appropriate sentence should serve to prevent the particular defendant from committing such crimes while incarcerated. Unlike the first two factors, this is a factor the Court is better able to evaluate than Congress and the Sentencing Commission. In *Phelps* the Court explained:

> Of course . . . it is also true in that there are certain traditional sentencing considerations which the Court is uniquely capable of assessing and weighing in a given case (e.g., the need to protect the public from further crimes of a particular defendant, the need to provide a particular defendant with vocational training, medical care, and/or correctional treatment, and the need to provide restitution to any victims).

*Phelps*, 366 F. Supp. 2d at 589 n.4.

Defendant has no prior convictions for violent crimes, nor does the revised PSR indicate he has a proclivity toward violence. He has, however, engaged in conduct which endangered his fellow citizens by supplying an ingredient to an illegal substance which has had serious negative effects on his community. Curbing the spread of methamphetamine in Defendant's region requires the suppliers of its precursor ingredients to be incapacitated for a sufficient length of time. Though not as significant as the retribution and deterrence factors discussed above, this factor has also informed the Court's sentencing of Defendant.

        d.        **Need of Sentence to Provide the Defendant with Needed Rehabilitation**

The fourth factor identifies the rehabilitative function of sentencing. This is a factor the Court is better able to assess. *See Phelps*, 366 F. Supp.2d at 589 n.4. Here, the Defendant does not suffer from substance abuse or mental health problems himself. He is considered a low risk to abuse drugs in the future, so he will not be subjected to mandatory drug testing. Defendant may choose to participate in voluntary rehabilitation programs while in prison.

**III.    CONCLUSION**

The Court has determined that the PSR calculates the Guideline range correctly, and that a within-Guidelines sentence is appropriate to fulfill the considerations of 18 U.S.C. § 3553(a). For the foregoing reasons, the Court has sentenced Defendant to a prison term of 360 months and a term of supervised release of three years.

**/s/**_____

**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

22